BRITISH & FOREIGN MARINE INS. CO. v. SOUTHERN PAC. CO.

(Circuit Court of Appeals, Second Circuit. February 20, 1896.)

1. SHIPPING—PAYMENT OF FREIGHT—BILL OF LADING.
   Where the bill of lading is silent as to the time for payment of the freight, the law implies that it is to be paid on delivery of the goods at the port of discharge.

2. SAME—CONNECTING CARRIERS—DAMAGE TO CARGO—PRO RATA FREIGHT.
   Cotton in course of transportation from Southern ports by way of New York to Liverpool, by various connecting carriers, but under through bills of lading, which stipulated that each carrier should not be liable for loss or damage beyond its own line, was in part damaged and in part totally destroyed by fire while on the pier at New York awaiting shipment by another line of steamers to Liverpool. The owners abandoned to the insurers, and the cotton, which was damaged only, was sold at New York, with the knowledge and acquiescence of the insurers, who received the proceeds less pro rata freight retained by the carrier. Held, that in respect to the cotton so sold the carrier was entitled to pro rata freight, because the acts of the insurers were in effect a voluntary acceptance of delivery at the intermediate port; but that pro rata freight was not payable upon that part of the cargo which was totally destroyed, since the contract to deliver at Liverpool was never performed or performance waived. 55 Fed. 82, affirmed.

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel by the British & Foreign Marine Insurance Company against the Southern Pacific Company to recover certain sums withheld by respondent as pro rata freight on certain cotton, which was in part damaged and in part destroyed while in possession of carriers. The decree was for libelant in respect to the freight on

the goods destroyed, but against it in respect to those merely damaged.    55 Fed. 82.    Both parties appealed.

Wilhelm Mynderse, for libelant.

Robert D. Benedict, for claimant.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge.    A large number of bales of cotton were shipped under 52 bills of lading from various points in Louisiana and Texas to points in Europe.    Thirty of the bills of lading are railroad bills acknowledging receipt of such and such bales at various points on the Houston & Texas, etc., Railroad, to be carried to Liverpool or Genoa, in this way, viz. by railroad to Galveston, thence by the Morgan Line of steamers to New York, and thence by some line of trans-Atlantic steamers to Liverpool or Genoa. The other 22 bills of lading cover shipments from Galveston or New Orleans to Liverpool, Bremen, or Genoa by way of New York; the carrier to New York being the Morgan Line of steamers, and the carrier thence to port of destination being some trans-Atlantic line, named in the bill.    There are variances in the phraseology of these bills of lading, which may be grouped into five different forms, but the variances are immaterial to the case made here, and need not be rehearsed.    In all of them the rate of freight named in the bill is a through rate from the place of shipment to the place of delivery at so much per pound.    Three of the forms provide expressly for payment of freight "immediately on landing the goods"; the other two forms are silent as to the time for payment of the freight, but it is well settled that in such cases the law implies that it is to be paid upon delivery of the goods at the port of discharge. Carv. Carr. by Sea (2d Ed.) § 543.    By slightly variant phraseology all the bills of lading provide that the liability of each carrier shall cease on his delivery to the next carrier.

The cotton reached the Morgan Line pier in New York, and on February 28, 1887, while certain portions of the shipments were either on the pier or on partially loaded lighters alongside the pier, a fire occurred, by which some of the bales were destroyed and other bales were injured to such an extent that, instead of being reconditioned, and forwarded to destination, they were sold here. The libelant was insurer upon the cotton covered by the 52 bills of lading, and in consequence of the fire paid to its respective insured total losses in respect to the cotton destroyed or sold in New York, and took assignments of the rights of the assured on the proceeds.  An adjustment was made, the details of which need not be recited, and from the net proceeds of the sale the respondent reserved $2,318.60 as pro rata freight on the cotton sold and $614.72 as pro rata freight on the cotton destroyed, turning over to the insurance company only the balance left after making these deductions.    Libelant sued to recover both sums, and the district court sustained the claim as to the second item, viz. pro rata freight on cotton sold, and dismissed the libel as to the other.    Both sides appeal.

The libelant's counsel has discussed at some length the leading authorities on the subject of pro rata freight, but, in view of the undisputed facts set out in the record, it is unnecessary to review them here.    He quotes, and does not question the accuracy of, Dr. Lushington's statement in The Soblomsten, L. R. 1 Adm. & Ecc. 297, that a claim for pro rata freight is justified where there had been "a voluntary acceptance of the goods by their owner at an intermediate port in such mode as to raise a fair inference that the further carriage of the goods was intentionally dispensed with." Although the libel alleges that certain of the said bales "were so damaged that they could not be forwarded to destination,"—an allegation admitted by the answer,—such averment is not necessarily to be taken as implying any more than that the condition of these bales was such that they could not go forward without such expensive reconditioning as would make an effort to forward them a losing venture.    So long as the cotton still existed,—and the language quoted imports a continued existence as damaged bales,—it is difficult to understand why it was not physically possible for the shipowner to load and carry it to Europe.    As to each damaged bale, therefore, there arose the question whether it should be reconditioned and forwarded or sold for the benefit of all concerned.    It appears from the evidence that the insurance company, which, as abandonee of the damaged cotton, represented the cargo owners, was from the beginning in communication with the representatives of the carrier; that it was informed as to every important step taken; that when there was any question as to whether a bale of cotton should be reconditioned for forwarding or be sold here it was informed and consulted with; and that whatever course was taken, was taken with its approval and concurrence.    There is no contradiction of this testimony, and, in our opinion, it clearly makes out a case of voluntary acceptance at the intermediate port, any further carriage of those particular bales being intentionally dispensed with by the owner, and implies a contract to remunerate the carrier for the service actually performed.    The district court offered to take further proofs if any question was made as to the proper proportion of the whole freight to be applied pro rata itineris, and, no objection being made there by libelant, it is to be presumed that the sum fixed by that court is fair and just.

From the decree of the district court the respondent also appeals, insisting that the carrier should be allowed to reserve from the proceeds of the damaged cotton pro rata freight for the bales which were totally destroyed, and which, of course, were never accepted by the owner at the intermediate port, and, being no longer in existence, could not be reconditioned and forwarded as damaged bales.    No authority is cited in support of this contention.    Presumably none could be found, for it is elementary that, except in those cases where by express contract the freight is stipulated to be paid in advance, delivery at the port of discharge is a condition precedent to the shipowner's right to have the freight.    "Unless the

goods have been carried to that port, and are there ready to be delivered, the freight has not been earned. * * * If the shipowner has been prevented from carrying the goods to their destination, although by causes which he could not control, he cannot claim any part of the freight; for he has not earned it." Carv. Carr. by Sea, §§ 543, 547. The only exceptions to this rule are where the completion of the voyage has been prevented by the freighters, or where the cargo owner takes delivery of the goods or their proceeds at a different place from that originally agreed, under circumstances which show that that was intended to be treated as a substituted performance of the contract. No question arises here of substantial delivery of cargo, some small part having been lost, under a contract for payment of a lump freight. The freight stipulated here is so much per pound transported. It is urged that since the bills of lading provide for successive transportations by successive carriers, with a provision that the liability of each carrier for loss or damage of the goods shall cease on his delivery of the cotton to the next carrier, each separate transportation should be treated as a separate voyage. But the contract is a single one for the entire transportation from the port of original loading to the port of ultimate destination. The carrier who received the goods agreed with the shipper, directly for himself and as agent for the two other carriers, that they would transport the cotton the entire distance for a stipulated freight, to be paid upon delivery at destination. The shipper sought carriage for his goods, not to New Orleans, nor to New York, but to Europe; and when three carriers, having formed a combination for the entire carriage, take his goods under a contract by the terms of which the entire compensation for that carriage is made dependent upon delivery at final destination, there is no reason why a court should alter those terms. Had the carriers chosen to apportion the freight in advance, and to require the shipper to pay separately for each successive stage of the voyage, it was competent for them to insert such provisions in the contract. Not having done so, their contract must be interpreted as such contracts of affreightment always have been, and their right to demand freight be held dependent upon delivery at destination.

The decree of the district court is affirmed, but, as both sides appealed, without interest or costs.