SCOW NO. 190 and FOUR HUNDRED AND FIFTY BALES COTTON.

(District Court, D. Maryland. July 12, 1898.)

CARRIAGE BY SEA — CONNECTING LINES — DAMAGE IN TRANSIT — PRO RATA
FREIGHT.
When goods, shipped for long distances under through bills of lading,
which recognize several distinct carriers and stages of transportation, are
damaged at one of the recognized points of transshipment so that their
further transportation becomes impracticable, and an immediate sale is
necessary for the interests of all concerned, the carrier which has perform-
ed the last stage of the carriage, and advanced the freights of preceding
carriers, is entitled to pro rata freight.

J. Southgate Lemmon, for Baltimore Steam-Packet Co., intervening
petitioner.
Schumacher & Whitelock, for claimant of cotton.

MORRIS, District Judge. This suit originated in a libel for sal-
vage filed May 18, 1898, by one Schultz, owner of a steam tug, against
the Bay Line scow No. 190 and 450 bales of cotton. On May 17,
1898, about noon, a fire broke out on the wharf of the Baltimore
Steam-Packet Company, usually called the "Bay Line," in the port of
Baltimore, while a scow belonging to said Bay Line was lying at its
wharf, having on it 450 bales of cotton, just brought from Norfolk
by one of the Bay Line steamers, and which was about to be sent on
board an ocean steamer of the Johnston Line, to be carried to Liver-
pool. The libelant, Schultz, alleged that about 1 o'clock on the day
of the fire he discovered the scow adrift in the harbor, with the cotton
on fire, and that he had towed the scow to a place of safety, and,
by pumping water upon the burning cotton, he had, with some as-
sistance from other steam tugs, finally quenched the fire, and had
saved the scow and a great part of the cotton. On the 20th May, Mr.
William Cunningham, as agent of the owners of the cotton, filed in
the case his claim for the cotton; and the Baltimore Steam-Packet
Company, its claim for the scow. By agreement the damaged cotton
was delivered to Mr. Cunningham, in order that he might deal with
it for the benefit of all concerned. Upon a survey the cotton was
found to be much burned and wet, and the bales bursted, and marks
not decipherable, so that it was totally unfit for shipment to Liver-
pool; and the surveyor recommended that it be sold. On the day
after the fire the agents of the Johnston Line, learning of the con-
dition of the cotton, notified the steam-packet company that they
would not receive it. Mr. Cunningham had the cotton at once put
in condition for immediate sale, and on May 26th it was sold at auc-
tion as wet and damaged cotton. The sound value of the 450 bales
was $13,685.45. The net proceeds of the sale were $8,560.03. Out
of these proceeds, Mr. Cunningham has, by agreement, settled the
claim for salvage, and other expenses, and has in hand the remain-
der, subject to such decree as may be passed in the matter now before
the court. The present controversy arises upon a petition of the
Baltimore Steam-Packet Company to be allowed out of the fund a
claim for freight pro rata itineris. The cotton had been shipped

from places in Georgia to be carried by railroad to Norfolk, Va., and from there had been brought on a steamer of the Baltimore Steam-Packet Company, called the "Bay Line," to Baltimore, to be delivered by it, upon lighters, to a steamship of the Johnston Line, to be carried to Liverpool. For 200 of the bales there had been issued through export bills of lading, at an agreed through rate of so much per 100 pounds, from Newman, Ga., to Liverpool. These bills of lading called for transportation by the Atlantic & West Point Railroad to Atlanta, by the Southern Air Line to Norfolk, by the Bay Line to Baltimore, and by the Johnston Line to Liverpool, with different stipulations for different parts of the route. The other 250 bales had been brought from Georgia by railroad to Norfolk, and a bill of lading had there been issued by the Bay Line and the Johnston Line at a through rate per 100 pounds from Norfolk, via Baltimore, to Liverpool. There was a memorandum on the bill of lading that $301.63 back charges had been paid. It was also stipulated that a delivery by the Bay Line (the cotton being lightered at shippers' risk) to the Johnston Line should end the liability of the Bay Line. The through rate was divided among the carriers by agreement, and, according to their understanding, each paid when it received the cotton the accrued freight charges of the preceding carriers. This was, however, an arrangement between the carriers which did not concern the shippers, as they were only to pay the through rate upon landing of the cotton at Liverpool, but it was notice to them that the cotton was to be carried from point to point by successive carriers. With regard to the condition of the cotton after the fire, it was obvious to all concerned that it was. commercially speaking, impossible to send it forward. A considerable quantity had been burned up. All the bales had been burst open, or so defaced that the baling and the marks were gone. The agents of the ocean steamer would not touch it, for fear that fire might break out again in some portion of it. There were no appliances in Baltimore for putting it into merchantable shape, if it were anywhere possible to do so. It was recognized by all that the only sensible course was to accede to Mr. Cunningham's suggestion,—that he, as representing the underwriters and owners, should take the damaged cotton in charge, and dispose of it promptly, before the damage and expenses made the loss greater.

The general rule is that the freight cannot be recovered unless the stipulated voyage has been actually performed, or is prevented or is dispensed with by the shipper; and there is at common law no implied promise to pay pro rata itineris for carrying the goods a part of the voyage unless the owner of the goods voluntarily, and not under compulsion, accepts the goods at an intermediate point in such a way as to raise a fair inference that further carriage of the goods was intentionally dispensed with. Vlierboom v. Chapman, 13 Mees. & W. 230; Osgood v. Groning, 2 Camp. 466; Hunter v. Prinsep, 10 East, 378; Mitchell v. Darthez, 2 Bing. N. C. 555; Caze v. Insurance Co., 7 Cranch, 358; Hurtin v. Insurance Co., 1 Wash. C. C. 530, Fed. Cas. No. 6,942; The Nathaniel Hooper, 3 Sumn. 542, Fed. Cas. No. 10,032; Hutch. Carr. § 455 et seq.; 1 Pars. Adm. 239. Under the old rule applicable to continuous voyages, it would seem

that when goods were damaged in the course of the voyage, and from necessity sold at an intermediate port, they were not liable. for any freight whatever. The Nathaniel Hooper, 3 Sumn. 542–549, Fed. Cas. No. 10,032. But more recently, and with respect to the carriage of goods for long distances under bills of lading which recognize several distinct carriers and stages of transportation, it has been held in the admiralty that when the further transportation of the goods is prevented by some incapacity in the goods themselves, and a condition of things arises which makes a sale, or delivery to those representing the owner of the goods, at one of the recognized points of transshipment, and where there is a market for the goods, the only really practicable course, then a reasonable rule of partial compensation for the service performed may be applied. The case of British & Foreign Marine Ins. Co. v. Southern Pac. Co., heard first in the district court for the Southern district of New York (55 Fed. 82), and then on appeal in the circuit court of appeals for the Second circuit ([1896]; 18 C. C. A. 561, 72 Fed. 285), was in its facts substantially similar to the present case. The finding of facts in that case does not state the difficulties of forwarding the damaged cotton as strongly as the evidence shows them to have been in this case. But the difficulty was in fact the same. No refusal by any ocean steamer was proved, as in that case; but it is obvious that no steamship company would want to take on board for an Atlantic voyage a lot of partially burned cotton, recently in a fire, and no merchant would want to send such merchandise to Liverpool. It seems to me to be making impractical distinctions, likely to confuse and embarrass business transactions, to attempt to distinguish the facts of that case from this. In the case referred to it was held in both the district court and in the circuit court of appeals that the Southern Pacific Company, which had brought the cotton to New York from ports in Texas, and had advanced freights to the preceding carriers, who had brought it from the interior,—it all being billed through for shipment from New York to European ports by steamers from New York,—was entitled to be paid pro rata freight on the cotton damaged by fire while on the pier or in lighters at New York, and which was sold because damaged and not fit to be carried forward. It was held that acceptance or acquiescence by those representing the owners of the cotton under such circumstances raised a fair inference that further carriage of the cotton was dispensed with, and implied an agreement to pay pro rata freight. In these commercial cases the rule should be uniform and certain and easily applied, and it is important that the courts should not lend themselves to confusion by subtile distinctions. The rules of general average, and for settling losses arising from disasters, must be somewhat arbitrary; but it is most important that they should be fixed, in order that merchants, carriers, and insurers may make their contracts understandingly. Accepting, therefore, the decision of the circuit court of appeals of the Second circuit as the rule to govern this case, I hold that the petitioner is entitled to receive the back charges for freight paid by it in respect to the cotton not destroyed, and its freight charges on the cotton not destroyed.

These items of freight and back charges nonallowed the petitioner must contribute its proportionate share of the salvage and attendant expenses. In respect to the cotton destroyed, the petitioner can recover neither the back charges nor its freight.