## THE NORMAN PRINCE.

(District Court, S. D. Alabama. January 10, 1911.)

### No. 1,269.

1. SHIPPING (§ 104*)—CONVERSION BY VESSEL—LOADING CARGO WITHOUT AUTHORITY.

The agent of the owner made a conditional sale of a raft of timber, retaining title until payment of the price, and with his consent the purchaser towed it alongside a vessel and obtained from the mate in charge an "alongside receipt" in the agent's name. Being refused authority to draw a draft on a proposed consignee with bill of lading attached, with the consent of the agent he returned the receipt to the mate, who accepted it and removed the timber to a wharf at some distance, where its return was accepted by the agent of the owner. Later, without the knowledge of either, the vessel loaded the timber on board. No contract of affreightment therefor was made by any one with the ship. *Held*, that under such facts the taking of the timber was wrongful, and that the vessel was liable for its conversion.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 104.*]

2. SHIPPING (§ 145*)—"FREIGHT."

"Freight" is the hire or compensation paid for the use of a ship for carrying goods.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 145.*

For other definitions, see Words and Phrases, vol. 4, pp. 2973-2976.]

In Admiralty. Suit by S. O. Rogers against the steamship Norman Prince. Decree for libelant.

Stevens & Lyons, for libelant.
Pillans, Hanaw & Pillans, for respondent.

TOULMIN, District Judge. The facts of this case, as I find them from the evidence, are substantially these: The libelant was the owner of 86 pieces of hewn timber, which he put in the hands of King as broker and agent to sell for him. King made a conditional sale of the timber to one Barret. The condition was that the timber was not to be Barret's until he paid for it. There was a reservation of title in the owners until the purchase money was paid. It appears that Barret was endeavoring to arrange with a foreign correspondent for authority to draw a draft, with a bill of lading for the timber attached, for funds sufficient to pay for it. With this in view, King

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

permitted and authorized Barret to deliver the timber to the steamer Norman Prince to get such bill of lading. This was on September 2, 1910. On the same day Barret delivered the timber alongside the ship and received from the mate, the first officer of the ship, a receipt called "alongside receipt." The receipt was taken by Barret in King's name. Later on said day (September 2d) Barret received from his foreign correspondent a cablegram refusing authority to him to draw the proposed draft. Barret then ordered the receipt to be returned to the ship and the timber to be taken away. This order was concurred in by King, and the receipt and order were given to one Harry Gill, who was a "boomman" attending to Barret's business, to execute. Next morning (September 3d) said Harry Gill gave said receipt to his brother George Gill and directed him to proceed to said ship, to give back the receipt to the mate of the ship, and to take the timber away. This was done on or about 8 a. m. on September 3d. The mate accepted the receipt, and said George Gill took the timber away without objection by the mate and moored it to the bank of the river some 70 or 75 yards from the ship, but not more than 40 feet from the outside of a raft of sawn timber which was tied to and alongside the ship. Said George Gill borrowed a line from the ship to use in removing said timber, and subsequently returned it to the ship. Martin, the ship's stevedore, came to the ship on the morning of September 3d to begin loading. He found a raft of sawn timber alongside the ship to be loaded, and the hewn timber, involved in this controversy, on the outside of the sawn timber. He said to the mate that he did not know there was any hewn timber to be loaded, and complained about its being in the position it was; that it was in his way and it must be taken away. While he was in conversation with the mate, George Gill, who was near, came up and said he would take it away and was going to put it alongside the piling. Gill had already given the receipt back to the mate, and told him he had come to take the hewn timber away. Martin had not seen Gill that morning until he came up when he (Martin) and the mate were talking. The mate testified that Gill had told him that Martin wanted the timber taken away and that he was going to move it for him. Gill's evidence is in direct conflict with this statement of the mate, and he is corroborated by Martin and by the circumstances shown by the other evidence in the case, and the mate is entirely without corroboration on this point. King, afterwards, on September 5th, saw the raft of hewn timber tied to the wharf on the west side of the river. The evidence tends to show that this was about 70 feet from the outside of the raft of sawn timber from which position it had been removed, and about 75 yards from the port side of the ship to the west bank of the river where the hewn timber raft was tied. From this position, without the knowledge or consent of the owner or of his agent, King, this raft was taken by the ship's stevedore, and with the knowledge of the mate, and without objection by him, loaded aboard the ship.

There was no contract of affreightment between the owner of this timber, or any one authorized by him, and the vessel. King, the agent of the owner, gave his permission and authority to Barret to

take possession of the timber for a specific purpose. That purpose was to get a bill of lading for the timber, on the credit of which Barret expected to raise the money to pay for it. Barret delivered the timber alongside the ship and received from the ship a receipt to that effect, called "alongside receipt." Shortly thereafter, and on the same day, he found he could not raise the money on the bill of lading with which to pay for the timber and acquire the title to it, as he had expected. Early the next morning Barret returned the "alongside receipt" to the mate of the ship and notified him that the timber would be taken away, and it was in his presence, and without any objection from him, taken by Barret's agent to the wharf on the west side of the river, and there tied to the wharf for the use and benefit of the owner, or of his agent, King, who had demanded its return. King practically accepted the return of the timber at that place, where he saw it tied to the wharf after its removal from alongside the ship by Barret's order, in which he concurred. He saw the timber so moored two days after its said removal from the ship. He gave no consent for the ship to retake it, and had no knowledge that it had done so and made it a part of its cargo already aboard the ship, for seven or eight days thereafter.

Neither the owner of the timber nor King, the agent, had made any contract of affreightment with the ship. The fact that Barret had, on August 30th, made a contract with Elder Dempster & Co. for shipment by the steamer Norman Prince of "170 loads of hewn pine timber," for New Castle Tyne, would not authorize or justify the taking by the ship of the timber of Rogers or King, and carrying it away, and that without giving bill of lading for it and without any stipulation for freight. Neither did the fact that Barret delivered alongside the ship the timber of Rogers or King, and obtained from the ship the "alongside receipt" "on account of King for Hamburg, 115 pieces hewn timber for cargo," in the absence of a contract of affreightment having been made for the same, authorize or justify the taking of the timber by the ship.

It is usual to incorporate the terms of a contract of affreightment in a written instrument called a "bill of lading." "Freight" is the hire or compensation paid for the use of a ship for carrying goods. The general rule is that the delivery of the goods at the place of destination, according to the bill of landing, is necessary to entitle the ship to freight. The conveyance and delivery is a condition precedent and must be fulfilled. This general rule may be varied by stipulations; but they must be in writing and be signed by the parties before they can control the operation of the law. Brittan v. Barnaby, 21 How. 528, 16 L. Ed. 177; Carver on Carriers by Sea (2d Ed.) § 543; 7 Am. & Eng. Enc. of Law (2d Ed.) 235; British & Foreign Marine Ins. Co. v. Southern Pac. Co., 72 Fed. 285, 18 C. C. A. 561.

Here, there was no bill of lading or other writing between the owner of this timber and the ship.

"It is an inherent element in a contract of affreightment that a vessel shall enter on the voyage named, and begin the carriage of the goods shipped, or, as it is technically called 'break ground,' before a claim to freight money can arise, unless the shipper of the goods, the vessel remaining ready to enter

on the voyage, undertakes to reclaim the goods. The circumstances under which the contract was entered into continuing the same so far as respects the vessel, the shipper cannot reclaim the goods without paying the full freight." The Tornado, 108 U. S. 342, 2 Sup. Ct. 746, 27 L. Ed. 747.

Where there was an original contract of carriage, as by bill of lading, etc., and the cargo owner prevents the performance of the contract, reclaims or redemands the goods, it would be unjust to the master and owners to deliver the goods back and not be paid the freight that might become due for the carriage of them.

Such, however, is not this case. There was no contract for the carriage of this timber. A delivery had been made alongside ship by a third person with the consent of the owner on condition, and an "alongside receipt" taken. The condition was not complied with, and the receipt was returned to the officer in charge of the vessel, accepted by him, and the timber taken away and redelivered to the owner. But it is claimed that said officer was without authority to take back the receipt and let the timber be taken away. I cannot, in view of the evidence, agree with this contention.

My opinion is that the taking of the timber by the ship's mate, who was in charge of the ship, or by the ship's stevedore, with the knowledge and consent of the mate, from the wharf where it was moored, and loading it aboard the ship, was wrongful, whether it was willfully or negligently done, or because the mate "did not think about it at all." It was, in my opinion, an act of dominion wrongfully exerted over another's personal property, inconsistent with his right, which amounts to a conversion of it, for which he is entitled to recover.

Let a decree be entered in favor of the libelant for $1,421.25.

The facts in this case and in that of E. M. Lindsey being the same, a decree for E. M. Lindsey for $515.17 will be entered.