MITSUI et al. v. ST. PAUL FIRE & MARINE INS. CO.†

(Circuit Court of Appeals, Ninth Circuit.    January 13, 1913.)

No. 2,085.

1. APPEAL AND ERROR (§ 181*)—NECESSITY OF OBJECTIONS AND EXCEPTIONS.
    Where no objections or exceptions have been saved as shown by the bill of exceptions, no errors of law occurring at the trial can be reviewed on appeal, but only such questions as arise on the record, and which it is not the office of a bill of exceptions to present.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1141–1151, 1157, 1158, 1160; Dec. Dig. § 181.*]

2. APPEAL AND ERROR (§ 544*)—RULINGS ON PLEADINGS—ERRORS OF RECORD.
    Action of the court in overruling or sustaining a demurrer to the complaint is a matter which appears by the record, and need not be presented by a bill of exceptions in order to authorize a review thereof.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2412–2415, 2417–2420, 2422–2428, 2449; Dec. Dig. § 544.*]

3. APPEAL AND ERROR (§ 725*)—ASSIGNMENTS OF ERROR—SUFFICIENCY—RULINGS ON PLEADINGS.
    An assignment that the court erred in overruling defendant's demurrer to the second amended complaint sufficiently pointed out the error complained of.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3002–3005; Dec. Dig. § 725.*]

4. PLEADING (§ 222*)—OVERRULING DEMURRER—LEAVE TO ANSWER.
    On the overruling of defendant's demurrer to the complaint, defendant is authorized by district court rule 15 to answer without leave.
    [Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 570–574; Dec. Dig. § 222.*]

5. PLEADING (§ 418*)—DEMURRER—WAIVER—ANSWER.
    Defendant does not waive a demurrer to the complaint for want of facts by answering over.
    [Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 1399, 1403–1406; Dec. Dig. § 418.*]

6. SHIPPING (§ 145*)—FREIGHT—MATURITY.
    In general, freight is not due and payable until delivery of the goods to the consignee at the port of destination or acceptance of the cargo at an intermediate port by the owner.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 502–505; Dec. Dig. § 145.*]

7. SHIPPING (§ 146*)—FOREIGN TRANSPORTATION CONTRACT—CONSTRUCTION.
    Defendants shipped cotton by rail from Oklahoma to be carried by steamer from Tacoma or Seattle to Japan, the bills of lading providing that the cotton was to be carried to port (A) Tacoma, Wash., and thence by steamship Tosca or steamer or steamers of the above companies to the port of (B) Kobe (or so near thereto as she or they may safely get), and to be delivered as consigned on payment of the freight thereon at the rate of $1.35 per hundred pounds from Oklahoma City to Kobe, with all other charges, advanced charges, and average, and without any allowance or credit or discounts, freight, and advanced charges payable at the carrier's option, in advance, in cash, or immediately on discharge of the property at the port (B) Kobe in its equivalent in local currency, at bank demand rate of exchange on New York.    The cotton arrived safely at Seattle, where it was transhipped by the G. Steamship Company, which prepaid the inland freight.    The steamer stranded en route, and the cotton

was totally lost. Prior to the prepayment of the inland freight, plaintiff insured the steamship company against partial or total loss, covering all inland freight and advanced charges, and after the loss paid the steamship company the marine loss, including the inland charges prepaid, whereupon the steamship company assigned to plaintiff all claims it possessed against defendants, and plaintiff brought suit to recover the inland freight so advanced. *Held,* that such contract was entire, and not divisible as between the inland and ocean freight, and hence, the cotton never having been delivered at destination, defendants were not liable for the inland freight.

[Ed. Note.—For other case, see Shipping, Cent. Dig. § 508; ·Dec. Dig. § 146.*]

Ross, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Northern District of California; Wm. C. Van Fleet, Judge.

Suit by the St. Paul Fire & Marine Insurance Company against Hachiroyemon Mitsui and others, doing business under the name of Mitsui & Co., sometimes known as Mitsui Bussan Kaisha. Judgment for plaintiff, and defendants bring error. Reversed.

Harrington, Bigham & Englar, of New York City (Howard S. Harrington, of New York City, of counsel, and Oscar R. Houston, of New York City, on the brief), for plaintiffs in error.

F. R. Wall, of San Francisco, Cal., for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON. District Judge.

WOLVERTON, District Judge. This ·is an action to recover for freight advanced by the assignor of the plaintiff for carriage and transportation of certain cotton from points in Oklahoma and Indian· Territory to Tacoma and Seattle, Wash. The complaint contains 38 counts, and is based upon 19 different shipments of cotton from points in Oklahoma and Indian Territory to Kobe and Yokohama, Japan. The cotton was carried on railroad lines from points of shipment to Tacoma and Seattle, thence by steamer to the Orient. Bills of lading accompanied each shipment, whereby the consigned property was to be carried to Tacoma, Wash., thence by steamer to the port in the Orient designated. Under the proofs, it was shown that it was optional with the carrier whether to ship to Tacoma or Seattle, Wash., and thence by steamer to Japan. The freight charge on the consignments was $1.35 per 100 pounds from point of shipment to port of destination. In the present instance the cotton was transhipped by the Great Northern Steamship Company on the steamship Dakota from Seattle. The steamship company, as had been its custom, prepaid the inland freight; that is, the freight from the point of shipment to Tacoma or Seattle. While en route to destination and in Tokio Bay, Japan, the Dakota stranded, and the cotton on board was totally lost. Prior to the prepayment of the inland freight, the defendant in error (plaintiff in the trial court) insured the Great Northern Steamship Company against partial or total loss by perils of the sea, including stranding of any and all inland freight and advance

charges paid by the steamship company. Later the defendant in error paid the steamship company the marine loss sustained by reason of loss of freight, including the inland charges prepaid, and thereupon the steamship company assigned and set over to the defendant in error all claims and causes of action it possessed against plaintiffs in error. Copies of the bills of lading and of the policy of insurance are attached to and made a part of the complaint. A demurrer was interposed to the second amended complaint, being the one last filed, on the ground that it does not state facts sufficient to constitute a cause of action, which was overruled. The issues being formulated, the cause was tried by the court, a jury being waived, resulting in a judgment for the defendant in error. From this judgment a writ of error is prosecuted.

The defendant in error has filed a motion to dismiss the writ, assigning several reasons, chief among which is that the bill of exceptions presents no ruling of the court made in the progress of the trial, and there are no special findings of fact.

[1] From an inspection of the bill of exceptions it is at once manifest that no objections or exceptions were saved, and hence no questions of law arising at the trial can now be presented to or considered by this court. But this is no obstacle to the court's considering such questions as may arise upon the record and which it is not the office of the bill of exceptions to present.

[2] The action of the court in overruling or sustaining a demurrer to the complaint is a matter which appears by the record, and no bill of exceptions is necessary for saving the questions pertaining thereto for the consideration of the appellate court. Whenever error is apparent upon the record, it is open to revision, whether it be made to appear by bill of exceptions or in any other manner. Suydam v. Williamson et al., 20 How. 427, 15 L. Ed. 978. And it was specifically held in Aurora City v. West, 7 Wall. 82, 19 L. Ed. 42, that, irrespective of the bill of exceptions, the writ of error brings up for review the decision of the court below in overruling a demurrer. See, also, Young v. Martin, 8 Wall. 354, 357, 19 L. Ed. 418.

Assignment of error No. 1, namely, that the court erred in overruling the defendants' demurrer to the second amended complaint, is specifically objected to on the ground that it does not point out the particular error asserted or intended to be urged; that the record does not show leave of the court to answer over; that the demurrer was waived by answering; that no exceptions to the ruling on the demurrer appear; and that the questions involved were subsequently submitted to the court in the progress of the trial. These may be answered seriatim.

[3-5] The form of the assignment would seem to be ample, as it points out the error relied upon. It was not necessary that defendant obtain leave of court to answer. Rule 15 of the trial court permits that without special leave. Nor was the demurrer waived by answering over. In Teal v. Walker, 111 U. S. 242, 4 Sup. Ct. 420, 28 L. Ed. 415, a demurrer was interposed to the complaint on the ground that it did not state facts sufficient to constitute a cause of

action. This was overruled with leave to answer, and answer was accordingly filed. As to the question involved here the court says:

"The error, if it be an error, of overruling the demurrer could have been reviewed on motion in arrest of judgment, and is open to review upon this writ of error. When the declaration fails to state a cause of action, and clearly shows that upon the· case as stated the plaintiff cannot recover, and the demurrer of the defendant thereto is overruled, he may answer upon leave and go to trial, without losing the right to have the judgment upon the verdict reviewed for the error in overruling the demurrer. The error is not waived by answer, nor is it cured by verdict. The question, therefore, whether the complaint in this case states facts sufficient to constitute a cause of action, is open for consideration."

The second objection is also not well taken. No exceptions are required to be saved to the ruling of the court on demurrer. The record shows the error if one is committed, and that is reviewable without further formality in saving the questions pertaining thereto for presentation in the appellate court. That the questions pertaining to the demurrer were further considered at the trial did not deprive the plaintiffs in error of their writ of error upon the record, whether they have a regular and formal bill of exceptions or not.

This answers also the objections to assignments Nos. 2, 3, and 4, which assignments are all that are now insisted upon. As to the merits of the controversy, it is plain that for want of a sufficient bill of exceptions the only question that can now be considered is whether the second amended complaint states facts sufficient to entitle the plaintiff to recover. The question presented is stated by counsel for plaintiffs in error as follows:

"Are the bills of lading involved indivisible contracts upon which freight is earned only on delivery of the goods at ultimate destination, or are they divisible into two parts, the land portion and the water portion, so that the inland freight is payable by the shipper on termination of the land carriage?"

It arises upon demurrer, as the complaint sets forth the bills of lading by copy, and turns upon the proper construction of such bills of lading.

[6] As a general rule, freight is not due and payable until delivery of the goods to the consignee. 6 Cyc. 493. As is said in The Ann D. Richardson, Fed. Cas. No. 410:

"The delivery of the cargo at the port of destination is considered a condition precedent to the right to freight, and without that the acceptance of the cargo at an intermediate place, by the owner of it, is necessary to enable the shipowner to maintain a claim to full, or pro rata freight."

See, also, Burn Line v. United States & A. S. S.·Co., 162 Fed. 298, 89 C. C. A. 278; The Tornado, 108 U. S. 342, 349, 2 Sup. Ct. 746, 27 L. Ed. 747; Hunter v. Prinsep, 10 East, 378, 394, cited and quoted from in the last-mentioned case.

[7] It is alleged· by the complaint in effect that Mitsui & Co. shipped the cotton by rail from points of original shipment to be carried to Kobe or Yokohama in Japan under and in accordance with certain bills of lading, and that, in accordance with the terms of said bills of lading or contracts of affreightment, said Great Northern Steamship·Company on or about the 17th day of February, 1907, paid as

inland or advance freight charges for the said transportation and carriage to Tacoma or Seattle, which has not been repaid. The contracts of affreightment, as shown by "Exhibit A" attached to the complaint, in so far as they provide for transportation of the cotton and touching the freight to be paid therefor, stipulate as follows:

"To be carried to the port of (A) Tacoma, Wash., and thence by S. S. Tosca or steamer or steamers of the above companies to the port of (B) Kobe (or so near thereunto as she or they may safely get) with liberty to call at any port or ports in or out of the customary route (in any order), and to be there delivered, as above consigned, or to his or their assigns upon payment of the freight thereon, at the rate of $1.35 cents from Oklahoma City to Kobe, payable as above in United States gold currency, per one hundred pounds gross weight, with all other charges, advanced charges and average, without any allowance or credit or discounts; freight and advanced charges payable at carrier's option, in advance, in cash, or immediately on discharge of the property at the port of (B) Kobe in its equivalent in local currency, at bank demand rate of exchange on New York."

There is no suggestion that the carriers exercised or declared their option that freight and advance charges should be paid in advance.

That the inland freight was paid by the steamship company is not questioned, and we are to determine by what right, obligation, or authority it paid such freight and what obligation Mitsui & Co. are under to reimburse the steamship company. The strong contention of defendant in error is that the contracts of affreightment are divisible as to freight and the time of payment thereof, and the theory rests upon the fact that they contain two parts by designation, namely, 1 and 2; part 1 relating to the delivery of the cotton at port (A) and part 2 to the delivery at port (B) and upon certain provisions contained in paragraphs 2, 3, 11, and 12. The provisions as set out in the briefs read:

"2. No carrier is bound to carry by any particular train or vessel. Every carrier shall have the right, in case of necessity, to forward said property by any railroad or route between the point of shipment and the point to which the rate is given.

"3. No carrier shall be liable for loss or damage not occurring on its own road or its portion of the through route."

"11. No carrier shall be liable for delay nor in any other respect than as warehousemen, while the cotton awaits further conveyance; and in case the whole or any part of the cotton be prevented from going from said port in the first steamer of the ocean lines above-stated, leaving after the arrival of such cotton at said port, the carrier then in possession is at liberty to forward said cotton by succeeding steamers of said line, or if deemed necessary, by any other steamer.

"12. This contract is executed and accomplished and all liability terminates on the delivery of the said property to the steamship, her master, agent, or servants, or to the steamship company, or on the steamship pier at the said port, and the inland freight charges shall be a first lien, due and payable by the steamship company."

The contracts are tripartite in form and purpose; that is, they are contracts in which the relations, duties, and obligations of three parties are set out and defined, namely, the connecting railroad lines, the Great Northern Steamship Company and Mitsui & Co. The contract for carriage itself is to be performed by the railroad companies

and the steamship company, they to carry from point of receipt of the cotton to port (A) namely, Tacoma or Seattle, thence by steamer to port (B) which is Kobe or Yokohama in Japan, all for the rate and sum of $1.35 per 100 pounds, one undivided consideration or lump sum to be paid by the shippers, the property to be delivered at the latter ports to the consignee or assigns on payment of the freight thereon. The stipulations as to this we have set forth more fully heretofore. Then it is further agreed that the service to be performed shall be subject to the conditions, whether printed or written on the face or back of the contract. The division of the contract as to freight is effected, if at all, by the conditions printed on the back thereof. Part 1 of these conditions provides that "with respect to the service until delivery at the port of (A) Tacoma, Wash., first above mentioned, it is agreed," etc., followed by twelve paragraphs, included among which are 2, 3, 11, and 12 above noted.

Part 2 reads:

"With respect to the service after delivery at the port of (A) Tacoma, Wash., first above mentioned and until delivery at the port (B) second above mentioned, it is agreed," etc.

Then follow 19 paragraphs. The carriers, through their agents, signed the bill of lading "severally, and not jointly."

By a reading of the contract it will be seen that part 1 relates almost exclusively to stipulations between the shippers and the connecting lines of railroad carrying to Tacoma, and not beyond. The 12 paragraphs thereof relate to and define the rights and duties as between the shippers and connecting railroad lines carrying to Tacoma, with the one notable exception provided by the last clause of paragraph 12 that "the inland freight charges shall be a first lien, due and payable by the steamship company." This clause, of course, was assented to by the shippers, but it is clearly not an express stipulation on their part to pay the freight charges when the railroad lines deliver the property to the steamship company, or upon the steamship pier, for such company. It is a direct stipulation, however, on the part of the steamship company to pay the freight, that is, what is denominated the inland freight, at that time to the railroad lines. Part 2 relates almost wholly to matters of concern between the shippers and the steamship company. A number of stipulations contained in part 1 are repeated in substance in part 2, where applicable. Thus, for instance, clause 8 in part 2 provides for the manner of ascertaining the amount of claim for loss if any shall have been sustained. The same thing is provided for in clause 3 of part 1. This indicates a purpose of holding separate the stipulations of the inland carriers with the shippers from those of the ocean carrier; hence the shippers' agreement with the former is in a manner distinct from that with the latter. There is, however, in part 2 no reference whatever to the freight charges, or to the time or conditions of payment thereof, except as contained in paragraph 3. This provides, among other things, that the carrier shall have a lien on all goods for all freight,

primages, etc., and that if, on the sale of the goods at destination, the proceeds fail to cover freights and charges, the carrier shall be entitled to recover the difference from the shippers. This would seem to be indicative of an intendment that freight should be payable at destination. So it would appear that the dividing· of the contract into parts 1 and 2 was but natural and analytical in the course of drafting, so that the shippers would be found to be dealing with the inland carriers and the ocean carriers separately, in so far as they could do so appropriately, and the · mere fact of such division is not persuasive of a purpose to make the inland freight payable by the shippers to the railroad lines when the property is delivered to the steamship company while in transit to destination.

Nor do we think that the stipulations contained in paragraphs 2, 3, and 11 of part 1 indicate an intendment that such freight should be paid by the shippers or consignees at any time prior to the time of the delivery of the property at destination. The contention as to these is cogently and sufficiently answered by the opinion of the court in the case of British & Foreign Marine Ins. Co. v. Southern Pac. Co., 72 Fed. 285, 288, 18 C. C. A. 561. Indeed that case, being so nearly parallel, is authoritative here. The court says:

"It is urged that since the bills of lading provide for successive transportations by successive carriers, with a provision that the liability of each carrier for loss or damage of the goods shall cease on his delivery of the cotton to the next carrier, each separate transportation should be treated as a separate voyage. But the contract is a single one for the· entire transportation from the port of original loading to the port of ultimate destination. The carrier· who received the goods agreed with the shipper, directly for himself and as agent for the two other carriers, that they would transport the cotton the entire distance for a stipulated freight, to be paid upon delivery at destination. The shipper sought carriage for his goods, not to New Orleans, nor to New York, but to Europe; and when three carriers, having formed a combination for the entire carriage, take his goods under a, contract by the terms of which the entire compensation for that carriage is made dependent upon delivery at ·final destination, there is no reason why a court should alter those terms."

This leaves but one other clause for consideration, namely, paragraph 12 of part 2. As to this it. is urged that since the shippers are parties to the contract they constituted the steamship company their · agent to pay the inland freight, and thereby became bound when the steamship company so paid such freight to repay it to such company, and thus that there was an assent to a division of the freight and an obligation to pay accordingly. In this we cannot concur. The case of The Hibernian, 10 Asp. Mar. Cases, 501, is strongly relied upon in support of the view, but it seems not to be properly understood. In that case a part of the goods was lost en route. When the remainder arrived at destination, the consignee sought their delivery without paying the freight on the goods lost. The contract was drafted in two parts as the one in suit. The first set of conditions as denominated by the court contained a clause 12 identical with clause 12 in the present contract. As to this clause, after quoting it, Lord Alverstone, C. J., stays: "This condition, in my judgment, has only

an indirect bearing upon the question we have to decide"—which was whether the carrier was entitled to freight upon the lost goods. The contract contained another clause, however, being 17, making the property covered by the bill of lading "subject to all conditions expressed in the regular forms of bills of lading in use by the steamship company at times of shipment and to all local rules and regulations at ports of loading and destination not expressly provided for by the clauses herein." Thus the regular forms of the bill of lading of the steamship company were also made a part of the contract. These forms provided, among other things, as follows:

"When the goods are carried at a through rate of freight, the inland proportion thereof together with the other charges of every kind (if any) are due on delivery of the goods to the ocean steamship, and the shipowner or his agent shall have a first lien on the goods in whole and in part until payment thereof."

While it was held that this clause last quoted was a counterpart of clause 12, and gave the ship a lien upon the property for advance freight charges paid, it was further held, based upon the idea that the ship thus acquired a lien upon the property, that the ship was entitled to enforce that lien upon the part of the goods carried to destination for the freight upon the goods lost as well as upon those not lost. Nothing beyond this was decided by the learned court. It is not authority for the contention that the shipper became bound to pay the accumulated freight when the property was delivered by the inland lines to the steamship company, and Moulton, L. J., was in great doubt whether the shipowner had a lien on the goods not lost for freight on goods lost as claimed.

The only rational interpretation of clause 12 is simply what it says, namely, that the inland charges shall be a first lien due and payable by the steamship company. The lien is in favor of the railway lines and for their protection. But, under the usages of connecting lines and steamship companies, the succeeding carrier pays the freight to those from whom the property being carried is received, and hence it is stipulated here that freight of the preceding railway lines shall be due and payable by the steamship company. This is in strict accord with the principal contract providing that the property shall be delivered at destination to the consignee on payment of freight. Any other view would be to cast a clause into the contract not found there.

We conclude, therefore, that the shippers were not bound to the payment of the inland freight when the cotton in transit was delivered to the steamship company at Seattle for further carriage to the Orient, nor did the shippers become bound to the payment of such freight to the steamship company upon its payment to the railway lines, although such company acquired a lien on the property for such freight paid. The property being lost, however, the lien was also lost, and the steamship company was without right of action against the shippers for the freight charges. The insurance company, the defendant in error, is in no better position than the steamship company; hence was not entitled to recover. Besides, British & Foreign Marine Ins. Co. v.

Southern Pacific Co., supra, the case of Scow No. 190, etc. (D. C.) 88 Fed. 320, supports this conclusion and is instructive.

The judgment of the Circuit Court will be reversed and remanded, with directions to dismiss the action.

ROSS, Circuit Judge (dissenting). I am unable to agree to the judgment in this case. As I read the bills of lading under which the cotton was shipped, they were several, and not joint, contracts. The whole frame of the instruments in my opinion shows this to be true; but, as if to make assurance doubly sure, the respective carriers by their agent expressly recited in the bills of lading agreed to and accepted by the shipper that they were "severally, and not jointly," executed. And all of their stipulations were expressly made binding upon the shipper, among which were the provisions of the twelfth subdivision of the first of the two parts into which the instruments were divided, which reads:

"12. This contract is executed and accomplished and all liability terminates on the delivery of the said property to the steamship, her master, agent, or servants, or to the steamship company, or on the steamship pier at the said port, and the inland freight charges shall be a first lien, due and payable by the steamship company."

Upon such delivery the railroad companies became entitled to the inland freight, and for its payment the steamship company became liable by virtue of its express contract contained in the clause just quoted, and for which the shipper was manifestly liable in the event the steamship company did not pay, for the debt was the debt of the shipper. But the steamship company did pay the inland freight, and that, of course, ended the shipper's liability therefor, and gave the steamship company the right of recovery against the shipper for such advance, to which right the appellee insurance company is justly entitled to be subrogated.

"The general doctrine," said the Supreme Court in Myrick v. Michigan Central R. R. Co., 107 U. S. 102, 107, 1 Sup. Ct. 425, 429 (27 L. Ed. 325), "as to transportation by connecting lines, approved by this court, and also by a majority of the state courts, amounts to this: That each road, confining itself to its common-law liability, is only bound, in the absence of a special contract, to safely carry over its own route and safely to deliver to the next connecting carrier, but that any one of the companies may agree that over the whole route its liability shall extend. In the absence of a special agreement to that effect, such liability will not attach, and the agreement will not be inferred from doubtful expressions or loose language, but only from clear and satisfactory evidence." As will be seen from the provisions of the bills of lading in the present case, so far from there being anything to indicate any obligation or liability on the part of the railroad companies for any part of the water transportation involved, it was expressly stipulated that their obligation ended with the delivery of the property to the steamship company.

Nor do I see, in view of the express stipulations of the bills of lading to which reference has been made, that the fact that a through freight rate was therein fixed is of any importance. It was of no in-

terest to the shipper what portion of such rate was to go to the inland transportation companies and what portion to the steamship company. In a case somewhat similar to the present, Cincinnati, N. O. & T. P. Ry. Co. v. N. K. Fairbanks & Co., 90 Fed. 467, 470, 33 C. C. A. 611, 615, Judge (now Mr. Justice) Lurton said:

"In this day of advanced methods in the carriage of goods, very little significance can be attached to the mere giving of a through rate for a shipment necessarily passing over the line of more than one carrier. The presumption is rather that it undertook to contract for itself and the connecting carrier, severally and not jointly."

In the present case there is no need to rely upon any such presumption, for the agreement between the shipper, the inland carriers, and the steamship company was clearly expressed.

In my opinion the judgment should be affirmed.