MERCHANTS' & MINERS' TRANSP. CO. v. SEVEN HUNDRED AND ONE BALES OF COTTON.

(District Court, E. D. Pennsylvania. July 24, 1914.)

No. 42 of 1912.

1. SHIPPING (§ 146*)—CARRIAGE OF GOODS—FREIGHT—WHEN EARNED—CONTRACT FOR THROUGH CARRIAGE.

Where an initial carrier, for itself and connecting carriers, contracts with a shipper for the transportation of goods from the point of loading to the port of final destination for a stipulated freight, the contract is a single one, and the right to freight is dependent on delivery at destination. In such case pro rata freight is not recoverable for a portion of the carriage, unless there is a voluntary acceptance of the goods at an inter

───────

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

mediate port in such a mode as to raise a fair inference that their further carriage was intentionally dispensed with.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 508; Dec. Dig. § 146.*]

2. SHIPPING (§ 146*)—CARRIAGE OF GOODS—FREIGHT—WHEN EARNED—CONTRACT FOR THROUGH CARRIAGE.

Libelant was an intermediate carrier of a shipment of cotton from Augusta, Ga., to Liverpool, under through bills of lading; its part of the transportation being from Savannah to Philadelphia. On the voyage a fire occurred, and the cotton was damaged by fire and water. On arrival at Philadelphia the underwriters, as agents for the owners, refused to consent to the sale of the damaged cotton, but demanded that it be forwarded to destination, and, the connecting carrier having refused to receive it, libelant libeled it for its ratable share of the freight. There was no provision in the bills of lading for freight pro rata itineris to be earned by an intermediate carrier, except in case the cotton was sold short of its destination. *Held* that, the contract not having been performed, no freight was earned, and libelant could not recover.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 508; Dec. Dig. § 146.*]

In Admiralty. Suit by the Merchants' & Miners' Transportation Company against 701 bales of cotton. Decree for respondent.

Lewis, Adler & Laws, of Philadelphia, Pa., for libelant.

Conlen, Brinton & Acker, of Philadelphia, Pa., for claimant.

THOMPSON, District Judge. This is a libel for freight against 701 bales of cotton carried by the libelant from Savannah, Ga., to Philadelphia, Pa., as intermediate carrier under through bills of lading from Augusta, Ga., to Liverpool, Eng. Watson, Moody & Co. shipped from interior points in the south by rail to Savannah 856 bales of cotton under through bills of lading issued by the Southern Railway Company and the Georgia & Florida Railway Company, by which the cotton was to be carried by the Merchants' & Miners' Transportation Company from Savannah to Philadelphia, and there delivered to the American Line to be carried to Liverpool, Eng. The inland freight was prepaid. The freight from Savannah to Liverpool was 22½ pence, of which, by agreement between the libelant and the American Line (not set out in the bills of lading), the Merchants' & Miners' Transportation Company were to receive 15 cents per hundred pounds and the American Line 30 cents per hundred pounds. While being carried on the steamship Berkshire of the Merchants' & Miners' Transportation Company, a fire broke out in the cotton, in consequence of which the ship was sunk off Cape Hatteras to extinguish the fire, but was ultimately raised and brought the cotton to Philadelphia, where it was discharged in a burnt, charred, and wet condition. After discharge, notice was given to Watson, Moody & Co., the owners, and to the British & Foreign Marine Insurance Company, their underwriters, of the condition of the cotton. A marine adjuster was employed by all parties in interest to examine and recommend the disposition of the cotton, and it was recommended by him that it be sold at Philadelphia. The British & Foreign Marine Insurance Company, underwriters and agent for Watson, Moody & Co., declined to agree to this recommenda-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tion or to accept the 701 bales which could be identified; the balance (155 bales) being so badly charred as to render identification impossible. As to the 701 bales, the British & Foreign Marine Insurance Company demanded that the cotton be sent forward, and it was accordingly tendered by the Merchants' & Miners' Transportation Company to the American Line, the succeeding carrier, who declined to receive it upon the ground that it was dangerous to carry on account of the probability that fire would break out in it again. Notice of the refusal of the American Line to receive and transport the cotton was given to Watson, Moody & Co., and to the underwriters, who still demanded that it be sent forward. This the Merchants' & Miners' Transportation Company declined to do, for the reason that other lines besides the American Line would not receive it, except at increased rates and at the sole risk of the shippers. The underwriters offered to accept the cotton, provided no claim for freight pro rata itineris was made by the libelant. The offer was refused, and the libelant thereupon demanded its freight of $525.75 before the cotton would be released to the underwriters or owners. This being declined, a libel was filed herein for the freight, security entered, and the cotton delivered to the claimant, Watson, Moody & Co., the owners. The cotton was subsequently carried forward at the instance of the underwriters at a freight in excess of that called for by the bills of lading. When sold in Liverpool, it brought $4.45 per bale less than other cotton damaged in the same manner brought in Philadelphia free of any charge.

The claimants contend that, under the bills of lading, the libelant is not entitled to recovery of freight as an intermediate carrier pro rata itineris, because the contract of affreightment was an entire one for transportation from Augusta, Ga., to Liverpool, Eng., and the freight was not earned because of the failure of carriage to and delivery at Liverpool. The bills of lading, so far as material to the present controversy, provide as follows:

"To be carried to the port (A) Savannah, Ga., and thence by M. & M. T. Co. (October 15th) to Philadelphia, Pa., American Line (October 26th) to port (B) Liverpool (or so near thereto as steamer may safely get, with liberty to call at any port or ports in or out of the customary route), and to be there delivered in like good order and condition as above consigned, or to consignee's assigns, or to another carrier on the route to destination, if consigned beyond the said port (B) upon payment immediately on discharge of the property of the freight thereon, at the rate from Augusta to Savannah of 21 cents prepaid, and Savannah to Liverpool, England, of 22½ pence collect United States gold currency per 100 lbs. gross weight and advance charges, with all other charges and average, without any allowance or credit or discount, etc. It is agreed that if any goods are sold short of destination each carrier that has completed its part of the transportation shall have earned its agreed-upon proportion of the through freight, and the same with charges advanced shall be due and payable out of the proceeds thereof; for any distance carried each carrier shall on same basis have earned and be entitled to freight with charges advanced for such part of the transportation as has been accomplished. That the carrier shall have a lien on all goods for freight, primage and charges," etc.

It will be seen by the bills of lading that there was no provision for freight pro rata itineris to be earned by any intermediate carrier, except where the goods were sold short of their destination.

[1] The law in admiralty upon the subject of contracts for through transportation is well stated in the opinion of Judge Lacombe, in the case of British & Foreign Marine Insurance Co. v. Southern Pacific. Co., 72 Fed. 285, 18 C. C. A. 561 (C. C. A. Second Circuit). In that case cotton was shipped from southern points to Liverpool, Eng., under through bills of lading providing for transportation by the various railways to southern ports; thence by Morgan Line Steamships to New York; and thence by Trans-Atlantic Lines to Liverpool. While the cotton was at the wharf in New York, fire broke out, destroying part, and so badly damaging the rest that it was sold for the common benefit. The court held that the carrier was not entitled to any freight on the cotton destroyed, but was entitled to freight pro rata itineris on the damaged cotton, solely on the ground that the underwriters had voluntarily accepted the cotton at an intermediate port. Judge Lacombe said:

"It is urged that since the bills of lading provide for successive transportations by successive carriers, with a provision that the liability of each carrier for loss or damage of the goods shall cease on his delivery of the cotton to the next carrier, each separate transportation should be treated as a separate voyage. But the contract is a single one for the entire transportation from the port of original loading to the port of ultimate destination. The carrier who received the goods agreed with the shipper, directly for himself and as agent for the two other carriers, that they would transport the cotton the entire distance for a stipulated freight, to be paid upon delivery at destination. The shipper sought carriage for his goods, not to New Orleans, nor to New York, but to Europe; and when three carriers, having formed a combination for the entire carriage, take his goods under a contract, by the terms of which compensation for that carriage is made dependent upon delivery at final destination, there is no reason why a court should alter those terms. Had the carriers chosen to apportion the freight in advance, and to require the shipper to pay separately for each successive stage of the voyage, it was competent for them to insert such provisions in the contract. Not having done so, their contract must be interpreted as such contracts of affreightment always have been, and their right to demand freight be held dependent upon delivery at destination."

To the same effect is the decision in Mitsui v. St. Paul Fire & Marine Insurance Co., 202 Fed. 26, 120 C. C. A. 280. See, also, the Anna D. Richardson, Fed. Cas. No. 410; Burn Line, Ltd., v. U. S. & A. S. S. Co., 162 Fed. 298, 89 C. C. A. 278; Brittain v. Barnaby, 21 How. 527, 16 L. Ed. 177.

And to use the language of Judge Lacombe in British & Foreign Marine Insurance Co. v. Southern Pacific, supra:

"The only exceptions to this rule are where the completion of the voyage has been prevented by the freighters, or where the cargo owner takes delivery of the goods or their proceeds at a different place from that originally agreed, under circumstances which show that that was intended to be treated as a substituted performance of the contract."

To justify a claim for pro rata freight, there must be voluntary acceptance of the goods at an intermediate port, in such a mode as to raise a fair inference that the further carriage of the goods was intentionally dispensed with. Vlierboom v. Chapman, 12 M. & W. 229.

This is not an exception to the general rule, based upon the entirety of contracts, that freight is only due when the voyage is completed. It is merely tantamount to saying that the parties, by mutual agreement,

may rescind the contract at an intermediate port.    Hughes on Admiralty, p. 148.

[2] The libelant, however, claims that an exception to the general rule should be made in the present case because of (1) the danger of shipment and (2) its commercial inexpediency.    Counsel for the libelant have not been able to point to any authorities to sustain their position. The case of British & Foreign Marine Insurance Co. v. Southern Pacific Co. (D. C.) 55 Fed. 82, which was affirmed in 72 Fed. 285, 18 C. C. A. 561, cited above, is relied upon by reason of the language of the District Court, where it was said:

> "From the earliest times the rule of the maritime law has been different from that of the common law in respect to payment of pro rata freight; the rule being that where the ship, through accident or major force, has been prevented from completing her voyage, the owner, on receiving his goods, must pay ratable freight. Macl. Shipp. 478; Roccus, 81; Consolato, 151. And see other authorities cited in The Spartan [D. C.] 25 Fed. 44, 57. Upon this ground I must allow to the carrier in the present case a pro rata freight upon the damaged cotton, the proceeds of which were received by the libelant as the owners' representative. The present is a stronger case for a pro rata freight from the fact that the bills of lading contemplated in several respects the divisibility of the contract; and because the contract contained in the bills of lading was for the most part completely performed."

The decision in that case, however, was not based upon an exception to the rule but upon the ground that with the knowledge and acquiescence of the insurers, who represented the owners, the cotton was sold at the intermediate port for the benefit of all concerned, which amounted to a substituted performance for that stipulated in the contract.

The case of Scow No. 190 and Four Hundred and Fifty Bales of Cotton, 88 Fed. 320, in the District Court of Maryland, is cited by the libelant as instancing an exception to the rule.    In that case the suit originated in a libel for salvage, and, the agent of the owners having filed a claim for the cotton, it was by agreement delivered to him in order that he might deal with it for the benefit of all concerned.    It was by him put into condition for immediate sale and sold at auction as wet and damaged cotton.    That case is therefore not an instance of an exception to the rule, but, as in the case of British & Foreign Marine Insurance Co. v. Southern Pacific Co., upon which the decision was based, the sale at an intermediate port was by the consent of all parties, and there was therefore a rescission of the contract by acceptance of part performance of the agreement for through transportation.

In the present case there is nothing in the contract of affreightment under which pro rata freight may be recovered, and there are no circumstances in the case which can be construed as an acceptance by the claimant of anything short of full performance of through transportation.    To the contrary, the claimants consistently refused to accept the cotton short of its destination, and the contract must therefore be construed in accordance with its terms and with the well-settled rules of admiralty.

The libel will be dismissed at libelant's costs.