[No. 15384.   Department One.   March 1, 1920.]

NORTHERN PACIFIC RAILWAY COMPANY, *Respondent,* v.
JOHNSON & HIGGINS, *Appellant.*[1]

APPEAL (452)—REVIEW—HARMLESS ERROR—TRIAL DE NOVO.   Upon
a trial *de novo* on stipulated facts, the supreme court will disregard
facts not properly pleaded and evidence not properly in the record.

CARRIERS (12, 22)—BILLS OF LADING—CONSTRUCTION—PLACE OF
DELIVERY.   An ocean carrier of tea under a through bill of lading to
interior points cannot recover its charges on arrival of the goods
at Seattle, although the ocean charges were segregated and the
goods were to be delivered from the ship's deck for convenience of
connecting railways, where the bill of lading totaled the ocean and
freight charges as "freight payable on delivery"; since a carrier
must complete delivery to the consignee before it is entitled to
freight.

SAME (19-26) — DELIVERY — ACCEPTANCE AT INTERMEDIATE PORT.
Where an ocean carrier of tea, consigned to interior points under
through bills of lading, delivered the goods at a dock for the con-
venience of connecting railways, where they were damaged, com-
mingled and partly destroyed, and insurance adjusters took posses-
sion to recondition and forward identified portions of the consign-
ments or sell the damaged part, "with the assent of all parties in
interest," there was in effect a voluntary acceptance at an inter-
mediate port by the consignees of the identified goods, rendering
them liable for the ocean freight charges; but the carrier could not
recover ocean charges on unidentified and lost goods, since the
owners being unknown did not voluntarily accept delivery at the
dock.

CARRIERS (20)—CUSTOM (5)—MODIFYING CONTRACT.   A custom of
the port of Seattle for rail carriers to advance ocean charges can-
not be shown to modify a through bill of lading made in the Orient
which provided that it was to be construed according to English law.

Appeal from a judgment of the superior court for
King county, Gilliam, J., entered November 26, 1918,
in favor of the plaintiff upon stipulated facts, in an
action to establish a lien for freight charges.   Modified.

[1]Reported in 188 Pac. 30.

*Bogle, Merritt & Bogle,* for appellant.

*Geo. T. Reid, J. W. Quick,* and *L. B. da Ponte,* for respondent.

MAIN, J.—The plaintiff, as assignee, brought this action for the purpose of establishing a lien for ocean freight upon funds in the possession of the defendant as trustee. The cause was tried to the court largely upon stipulated' facts and resulted in a judgment in favor of the plaintiff. From this judgment, the defendant appeals.

The facts essential to be here stated are these: On or about the 1st day of October, 1915, there was shipped from certain points in Japan and China, by the British steamship Ixion, a quantity of tea and rice. By the bills of lading issued to the respective shippers, the tea and rice were consigned to certain points in the middle west and eastern states. The shipment was by way of the port of Seattle. Under the usual and ordinary course of business, the shipments would have been handled and the freight paid and collected as follows: Upon arrival at the port of Seattle, the goods would be delivered to a rail carrier for transportation to final destination. The freight charges for the water carrier would be paid or advanced to it by the rail line receiving the goods for further transportation, and billed as "advance charges," upon the rail carrier's expense bill, against the goods, and upon final destination the rail line would collect from the several consignees the amount advanced the water carrier for its freight, together with the freight due the rail carrier for its transportation.

On or about October 28, 1915, the Ixion arrived at the port of Seattle and discharged the goods described in the bills of lading on the dock known as Pier 14.

While the goods were in possession of the owner of the dock, and during the same day that they were discharged from the steamship, a part of them were damaged or destroyed by fire. Pier 14 was the place or station at which goods unloaded from ships of the steamship company were received by the inland carriers for further transportation.

Upon certain of the bills of lading, a rail carrier is designated, but on the remainder such carrier is not designated. The shipper or consignee had a right, in the first instance, to select the rail carrier over whose line the goods would move from Seattle to destination; and if neither the shipper nor consignee designated any particular carrier, then the water carrier would determine via whose lines the goods would be moved to destination. The steamship company had not established a through route or joint rate with any of the railway lines serving Seattle, and had no special interest in any particular line getting the business.

In consequence of the fire, many of the packages which contained the tea were broken open and the contents scattered over the dock, some thereof being totally destroyed and some damaged by fire and water. Many of the consignments lost their identity so that it could not be ascertained who was the consignor or consignee. Immediately after the fire occurred, the owners of the dock appointed the defendants, Johnson & Higgins, who are marine and fire insurance adjusters, to take charge of the cargo for all interests concerned, recondition and forward to destination such parts thereof as were and could be put in satis-. factory condition for forwarding, and to sell or otherwise dispose of the balance and hold the proceeds for the benefit of whomsoever in law was entitled thereto, and "this appointment was assented to by all the parties in interest."

Pursuant to this appointment, Johnson & Higgins took possession of the cargo, reconditioned and forwarded to destination, in accordance with the several bills of lading, such part thereof as was fit for forwarding, and all freight thereon, including the ocean freight, has been paid. That part of the cargo that could not be forwarded to destination without a total loss on account of damage sustained in the fire was sold by Johnson & Higgins at Seattle at the best price obtainable, and the proceeds of such sale are now in their possession. With respect to that part of the cargo sold that could be identified, such sales were made with the

"assent and approval of such consignees or their underwriters. The commingled and unidentified cargo was sold by the defendants without the specific assent or approval of the consignees, as the defendants did not know who were the consignees."

All of the sales made were assented to by the dock owners and by the representatives of the ocean carrier. As above stated, all the freight on the goods shipped to final destination has been paid and there is here no controversy over that. Upon that part of the cargo which could not be forwarded to final destination, the freight charges for the ocean carrier amounted to $4,995.55, and this is the sum here in controversy; the charges on the identified goods sold by the defendants being $2,012.43, on the unidentified goods, $1,229.07, on the lost and destroyed goods, $1,714.05. The respondent claims the right to recover the freight upon each of these three classes of goods, to wit: The identified, unidentified, and lost goods. The appellants dispute the right of the respondent to recover any of these sums. The bills of lading issued by the ocean carrier will be subsequently mentioned more in detail.

The appellant makes a number of assignments of error relative to the ruling of the trial court upon its motion directed to the reply to its answer. The case being tried to the court and the facts being largely stipulated, it does not seem necessary to review the ruling of the trial court upon this question. This court will disregard any facts not properly pleaded and any evidence not properly in the record.

Upon the merits, the first question is whether the ocean carrier had earned and was entitled to the payment of its freight when the goods were delivered at the port of Seattle. The appellant contends that the freight was not earned and was not payable until the goods had reached their final destination. The respondent makes the opposite contention, to wit: That the ocean contract was performed when the goods were delivered at the port of Seattle and that the freight was then due and payable. To determine this question recourse must be had to the terms found in the bills of lading. There were a dozen or more of such bills prepared upon printed blanks, alike in form, the consignees and consignors being different, as well as the point of origin and the point of destination. One of the bills will be taken as a type, and only those provisions thereof will be here set out which seem to be necessary for the determination of the question presented. Across the top of the bill of lading, in prominent type, underscored, appear these words: "Through Bill of Lading for Overland Points in America." Under this appears:

"Shipped or delivered for shipment in apparent good order and condition by Irwin, Harrisons & Crosfield. Inc., on board the steamship Ixion lying in or off the Port of Shimidza, Ten Hundred and Ninety (1090) pkgs. Tea . . . for delivery from the ship's deck (where the carrier's responsibility shall cease)

subject to exceptions and conditions both general and special hereinafter mentioned and to ship's engagements not hereby disclosed, and though altering the voyage of involving a deviation therefrom, at the port of Seattle or other port in Puget Sound, or so near thereto as she may safely get, for conveyance by connecting railways or steamships, always subject to the terms and conditions of the oncarrying conveyance, to Minnesota Transfer Intransit, or so near thereto as the carrier may safely get, for delivery to order of Brown Bros. Co. (Notify the Central Warehouse Co.), or to his or their assigns, he or they paying freight for the said goods, in American Gold Coin or its equivalent, without deduction (carrying interest where payment is delayed, at the rate of 5 per cent per annum), at rates as per margin. . . .

''Transhipment of cargo for ports where the ship does not call, or for shipowners purposes, to be at shipowners' expense, but at the risk of the owners of the goods from the time goods leave the ship's deck, where ship's responsibility shall cease. Goods forwarded by rail are deliverable at any railway station within or nearest to the port named, and must be taken away by the consignees immediately after arrival. Goods forwarded by steamship or otherwise for shipment or after transhipment to be subject to the conditions and exceptions of the forwarding conveyance, and at the risk of the owners of the goods. Goods to be forwarded as soon as practicable, but without liability of the shipowner for detention, and cost of warehousing to be borne by the owners of the goods. . . .

''Shipowners to have a lien on the goods for unpaid freight, and all charges becoming due hereunder, whether in the carrying ships or any hulk, lighter, craft or stores. . . .

''This bill of lading duly endorsed to be given in exchange for delivery order, if required, and freight if not already prepaid to be paid in cash before delivery.

''This bill of lading shall constitute the contract between the owners of the goods and the shipowners; it shall be construed and governed by English law, and

shall apply throughout the transit but always subject to the conditions and exceptions of the carrying conveyance.''

In the bill of lading as above quoted, it is provided that the freight should be ''at rates as per margin.'' On the margin appears the following:

FREIGHT ON:

| | | | |
|---|---|---|---|
| Ocean | 102,460 lbs. at $ .50 per 100 lbs. | .......... | $512.30 |
| Rail | 102,460 lbs. at 1.00 per 100 lbs. | .......... | 1,024.60 |

Freight payable on delivery    Gold    $1,536.90

Across this margin, was stamped the word ''Collect.'' The question then is whether the ocean carrier, under the bill of lading, had performed everything that it was required to perform and was entitled to its freight when the goods were delivered at the port of Seattle. It will be noted that the goods were to be delivered from the ship's deck for conveyance by connecting railways to the Minnesota Transfer Intransit. Then there is a provision for delivery to the order of Brown Bros. & Co., with a specification to notify the Central Warehouse Co. There is no provision for notice to anyone when the goods arrive at the port of Seattle. The freight to be paid as stated in the margin which, as above set out, segregates the ocean and the rail freight and then totals the two opposite the words ''freight payable on delivery.'' If the freight was to be payable by the consignee on delivery at Seattle, there would certainly have been some provision for notice there, and there would have been no necessity of lumping the two items of freight opposite the direction ''Freight payable on delivery.'' Under the terms of this bill of lading, it seems plain that the steamship company would not have the right, at the port of Seattle, to have held the goods subject to the freight, and demanded that the freight be there paid.

The bill is headed "Through Bill of Lading for Overland Points in America" and provides for the transportation of the goods to the Minnesota Transfer Company. It is true that the steamship company in the Orient could not make a contract covering the freight rate from the port of Seattle to the point of destination, because this rate is controlled by the tariffs filed with the interstate commerce commission. But this would not prevent the steamship company from through-billing the goods. The ocean freight being in such amount as might be contracted for, the rate from the port of Seattle to the destination would be the rate fixed by the interstate commerce commission. *Cosmopolitan Shipping Co. v. Hamburg-American Packet Co.*, 13 I. C. C. 266; *Armour Packing Co. v. United States*, 209 U. S. 56.

The terms of the bill of lading require the holding that the undertaking was one by which the ocean carrier, when it received the goods, agreed with the shipper, directly for itself and as agent for the other carriers, that they would transport the goods for the entire distance, and that the freight was to be paid upon delivery at destination. The bill of lading provided that the ocean carrier's liability should cease when the goods were delivered from the ship's deck; but even though there should be no liability on the part of the ocean carrier for damages thereafter occurring to the goods, it does not necessarily follow that, where liability for damages to the goods ceases, the freight becomes due and payable. It is the general rule that the carrier must make complete and final delivery to the consignee before it is entitled to its freight. *Mitsui v. St. Paul Fire & Marine Ins. Co.*, 202 Fed. 26; Carver, Carriage of Goods by Sea, p. 702. Under this rule, the freight in question cannot be recovered unless, under the facts, delivery was made at Seattle with the

approval and concurrence of the owners of the freight. Under the facts stipulated, Johnson & Higgins' appointment to take charge of the cargo, recondition and forward to destination such parts thereof as could be put in fit condition for forwarding, and to sell and otherwise dispose of the balance "was assented to by all the parties in interest." With respect to that part of the cargo which could be identified, the sales thereof were made with the "assent and approval of such consignees or their underwriters." With respect to the commingled and unidentified goods, they were sold without the "specific assent or approval of the consignees."

The circuit court of appeals for the second circuit, in *British & Foreign Marine Ins. Co. v. Southern Pac. Co.*, 72 Fed. 285, had before it litigation arising out of cotton shipped from certain of the southern states by way of New York to Liverpool by various connecting carriers, but under through bills of lading. While the cotton was on the pier at New York awaiting shipment by another line of steamers to Liverpool, it was in part damaged, and in part totally destroyed, by fire. The owners abandoned to the insurers, and the cotton which was damaged was sold in New York with the knowledge and acquiescence of the insurers, who received the proceeds. It was there held that, in respect to the cotton so sold, the carrier was entitled to *pro rata* freight, because the acts of the insurers were, in effect, a voluntary acceptance of delivery at the intermediate port; but that *pro rata* freight was not payable upon that part of the cargo which was totally destroyed, since the contract to deliver at Liverpool was never performed or performance waived. Applying the doctrine of that case to the facts here, the respondent is entitled to recover for the identified goods because, under the facts stated, Johnson & Higgins

took possession with the consent and approval of all parties interested, thereby acting as their agents, and sold the identified goods with the consent and approval of the owners. This was, in effect, a voluntary acceptance at an intermediate port. As to the unidentified goods and the lost goods, no recovery can be had because it cannot be held that the owners voluntarily accepted delivery at an intermediate port because such owners were not known and could not be ascertained.

Much is said in the briefs relative to the case of *Mitsui v. St. Paul Fire & Marine Ins. Co.*, 202 Fed. 26. In that case, cotton was shipped from the state of Oklahoma by way of the port of Tacoma and Seattle to Japan. The bill of lading provided that the rail freight should be paid by the ocean carrier when it received the freight, and it was so paid. While en route to its destination, the steamer upon which the cotton was shipped stranded, and the cotton on board was totally lost. The underwriters, having paid the loss, sought to recover for the freight advanced the railroad company. One distinction between that case and the present is, that there there was a specific agreement that the freight should be paid at the end of the rail transportation by the ocean carrier, while the bills of lading here involved contained no such provision. That was not an action to enforce a lien, but an action for a money judgment. The respondent claims the case is in point as sustaining its right to a lien. Had the bill of lading in this case expressly provided that the ocean freight was to be paid by the inland carrier at the port of Seattle, what is said in that case with reference to a lien would be in point. The freight not being due and payable at the port of Seattle, and the inland carrier not being required by the contract to advance the freight, it cannot be held that a right of lien would exist upon the fund derived

from the sale of tea for the freight upon goods which had not reached their final destination, where the freight was payable, and had not been delivered at an intermediate point with the consent and approval of the owners.

Some reliance is placed by the respondent on the fact that it was customary for the rail carrier at the port of Seattle to advance freight to the ocean carrier, even though not specifically required to do so by the bill of lading. The contract in question was made in the Orient and provided for the shipment of the goods to points in the middle west and eastern states, and especially provided that it should be construed and governed by the English law. Over objection, an English case holding that freight could not be collected unless goods were delivered in a merchantable condition at the destination of the carriage, was introduced in evidence. Whether this case is properly in evidence it is not necessary to determine, as the rule of law there stated would not change the disposition of the case. There is nothing in that case that would be inconsistent with the owner voluntarily accepting the goods at an intermediate point and thereby becoming liable for the freight earned up to that point. The custom of the port of Seattle cannot be held to modify a contract made in the Orient and which by its terms was to be construed according to the English law.

The respondent not being entitled to recover for the unidentified and lost goods, the cause will be remanded to the superior court with direction to eliminate those two items from the judgment.

Modified.

HOLCOMB, C. J., PARKER, MACKINTOSH, and MITCHELL, JJ., concur.